## ARTHUR KENT PEARSON *v.* STATE OF MARYLAND

[No. 148, September Term, 1982.]

*Decided December 7, 1982.*

The cause was argued before MORTON, LOWE and BISHOP, JJ.

*Thomas J. Bollinger* for appellant.

*Ann E. Singleton, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Warren B. Duckett, Jr., State's Attorney for Anne Arundel County,* and *Scott Patterson, Assistant State's Attorney for Anne Arundel County,* on the brief, for appellee.

BISHOP, J., delivered the opinion of the Court.

After a court trial in the Circuit Court for Anne Arundel County, Arthur Kent Pearson appeals from a judgment of guilty of conspiracy to violate the controlled dangerous substance laws. He argues that the court erred by denying defense motions to dismiss for lack of a speedy trial and to suppress wiretap evidence.

> 1. Did the trial court commit reversible error in denying appellant's motion to dismiss for lack of a speedy trial?

Appellant argues these points: (a) substantial prejudice and violation of due process caused by pre-indictment delay; (b) violation of his right to a speedy trial and trial within 180 days under Rule 746 caused by the failure of the court to consider the time the case was pending in the District Court; (c) post-indictment violation of Rule 746.

On August 12, 1980, appellant was arrested and charged under a District Court warrant. It is not clear from the record when defense counsel entered his appearance in the District Court, but it appears that this occurred sometime before the end of August 1980. On February 2, 1981, the District Court case was dismissed because the State decided to take the case before the Grand Jury. On April 6, 1981, the State took the case before the Grand Jury and obtained an indictment. On April 23, 1981, defense counsel entered his appearance in the Circuit Court. On July 17, 20 and 21, 1981, hearings on motions were held. On October 7, 1981, the case came to trial; judgment was rendered on November 10, 1981.

*a.*

*Substantial prejudice and violation of due
process caused by pre-indictment delay*

There was a seven month, six day lapse between the District Court charge on August 12, 1980, and the Grand Jury indictment on April 6, 1981. Appellant contends that this pre-indictment delay caused him to suffer substantial prejudice and denied him his constitutional right of due process. As authority for this contention he refers us to *United States v. Alderman,* 423 F. Supp. 847 (D. Md. 1976), in which the Court found that specific prejudice "woven into the fabric of prosecutorial delay, resulting in a denial of defendant's Fifth Amendment rights. . ." required dismissal of the indictment. *Id.* at 858. We find *Alderman* to be inapposite. In the case before us the trial court found no actual prejudice to appellant. Upon review of the record, we conclude that this finding was not clearly erroneous; Maryland Rule 1086. Nor does the record contain any evidence whatsoever of prosecutorial intent to delay. *See United States v. Marion,* 404 U.S. 307 (1971); *Smallwood v. State,* 51 Md. App. 463 (1982).

*b.*

*Speedy Trial and Rule 746*

Appellant contends that the State circumvented his constitutional right to a speedy trial and Maryland Rule 746 by bringing the charges first in the District Court on August 12, 1980, and then not obtaining a Grand Jury indictment until April 6, 1981. No argument on the constitutional speedy trial issue is presented in appellant's brief and therefore we will not respond. Maryland Rule 1031 c 5 and f. *Van Meter v. State,* 30 Md. App. 406, 407-08 (1976); *State Roads Comm. v. Halle,* 228 Md. 24, 31-32 (1962).

The main thrust of appellant's argument under Rule 746 is that the State should not be permitted to charge a defendant in the District Court and then subsequently obtain a Grand Jury indictment, yet not be charged under Rule 746 with the time between the District Court charge and the

indictment. Rule 746, however, begins to run not at the time the charge is filed or the indictment handed down, but either when counsel enters his appearance or when the defendant first appears in court pursuant to Rule 723, whichever occurs first. Furthermore, Rule 746 applies only to charges brought in the Circuit Court. *Brown v. State,* 27 Md. App. 233 (1975); Maryland Rule 701; *Goins v. State,* 293 Md. 97, 99 (1982), *see State v. Hicks,* 285 Md. 310, 315 (1979), on motion for reconsideration, 285 Md. 334 (1979). There is no provision for tacking the time between the District Court charge and a subsequent Grand Jury indictment to the time that begins running under the rule in the Circuit Court.

### c.

### *Post-indictment violation of Rule 746*

The very short answer to the argument that appellant's case was not tried within the 180 days required under Maryland Rule 746 is that the time under the rule started running on April 23, 1981, when counsel entered his appearance in the Circuit Court, and trial was held on October 7, 1981. The lapse between these dates was 167 days, well within the 180 day requirement. *Hicks, supra.*

The second and final question raised is:

2. Did the trial court commit reversible error in denying appellant's motion to suppress wiretap evidence?

### a.

### *The burden of proof of minimization*

The trial court ruled that the State did not have the burden of proving minimization, but that the defense would be required to show that the minimization requirement had not been met.

Sections 10-401 to 10-412 of the Maryland Courts and Judicial Proceedings Article and 18 United States Code,

§§ 2510-2520 govern the interception of wire or oral com-
munications, Courts and Judicial Proceedings Article,
§ 10-408 (e) provides that every order authorizing an inter-
ception

"... shall contain a provision that the
authorization to intercept ... shall be conducted in
such a way as to minimize the interception of com-
munications not otherwise subject to intercep-
tion. ..."

18 U.S. Code, § 2518 (5) contains the identical language.

The foregoing "requires the intercept procedure to be con-
ducted so as to reduce to the smallest possible number the
interception of 'innocent' calls," *United States v. Focarile,*
340 F. Supp. 1033, 1047 (D. Md. 1972), *aff'd sub nom. United
States v. Giordano,* 469 F. 2d 522 (4th Cir. 1972), *aff'd* 416
U.S. 505, 94 S.Ct. 1820, 40 L. Ed. 2d 341 (1974); *United
States v. Manfredi,* 488 F. 2d 588, 600 (2d Cir. 1973); *see
United States v. Clerkley,* 556 F. 2d 709, 715-16 (4th Cir.
1977). The burden of proof of minimization is on the State,
*United States v. Rizzo,* 491 F. 2d 215, 217-18 (2d Cir. 1974);
*Poore v. State,* 39 Md. App. 44, 71 (1978); however, all that
is required of the State is to produce evidence showing *prima
facie* compliance with the minimization requirements, and
then the burden of production and persuasion shifts to the
defendant. *Id.; See United States v. Manfredi, supra.*

At the time he heard the motion to suppress, the trial
judge in this case had before him the order and the return,
which included the tapes and 109 typewritten logs. The
intercept order contained the following:

"ORDERED that every effort be made to inter-
cept only those communications which reasonably
may be expected to relate to the aforesaid crimes,
and that the designated operators of the said elec-
tronic devices, and the supervisors in charge of the
investigation shall make a diligent effort to mini-
mize the interception of communications which are
not otherwise subject to interception, and to this

end a continuing log shall be maintained of these
[sic] precise time, dates, duration and location of
each intercepted communication or fragment
thereof, as well as the parties thereto, if
identifiable, and the general subject matter thereof,
. . ."

This language conforms with the statute. Although the
return itself makes no reference at all to minimization, the
tapes and logs must be considered parts of the return. When
so considered the return, including especially the logs,
clearly indicates compliance with the order as to
minimization and the extent of minimization. This
convinces us that the State met its burden of making a *prima
facie* showing of compliance with the statute.

The trial court's misallocation of the burden of proof con-
cerning minimization was patently harmless for two
reasons. First, as has been shown, the State met its burden
of showing minimization. Second, the evidence produced by
appellant and his co-defendants, far from weakening the
State's case, actually showed that the police complied with
the minimization requirement.

A burden of proof may be "satisfied by the actual proof of
the facts which need to be proved, *regardless of which party
introduces the evidence." Sergeant Co. v. Pickett,* 285 Md.
186, 203-04 (1979) (emphasis in original); *Parish v. Milk
Producers Ass'n,* 261 Md. 618, 692 (1971); 31A C.J.S. *Evi-
dence,* § 104, at 175-76 (1964). Even if the State failed to
make a *prima facie* showing of compliance, and therefore the
court erred in requiring the defendants to produce evidence
to show failure to minimize, the evidence the appellant and
others elected to produce would have rendered the error
harmless.

In *Spease and Ross v. State,* 275 Md. 88, 99 (1975) the
Court pointed out that:

"The standard for compliance with the require-
ment to minimize is the overall reasonableness of
the totality of the conduct of the monitoring agents
in light of the purpose of the wiretap and the infor-

mation available to the agents at the time of interception."

*Spease* also provides us with the following:

"A synthesis of the numerous court decisions dealing with the minimization requirement suggests that there are a number of factors which aid courts in determining the reasonableness of an interception. These include: (1) the nature and scope of the crime being investigated; (2) the sophistication of those under suspicion and their efforts to avoid surveillance through such devices as coded conversations; (3) the location and the operation of the subject telephone; (4) government expectation of the contents of the call; (5) the extent of judicial supervision; (6) the duration of the wiretap; (7) the purpose of the wiretap; (8) the length of the calls monitored; (9) the existence of a pattern of pertinent calls, which the monitoring agents could discern so as to eliminate the interception of non-pertinent calls; (10) the absence of monitoring of privileged conversations." *Id.* at 100.

Based on our review of the evidence, including the testimony, the transcripts and the logs, and considering the nature and scope of the controlled dangerous substance question, the obvious sophistication of those under surveillance, the location of the dwelling where the telephone was located, the expectation set out in the affidavit, the extent of judicial supervision, the duration, purpose and length of the calls monitored, coupled with the pattern of the pertinent calls and the clear efforts made by the agents not to monitor privileged conversations, we conclude that the minimization requirement was met. The only non-pertinent conversations that were actually monitored were those on which the agents had to make a judgment call. There were several conversations only partially monitored that we believe could lawfully have been completely monitored. If the agents erred, they did so to the benefit of those under

scrutiny. The standards for minimization were met. *Spease, supra; Poore, supra; Salzman v. State,* 49 Md. App. 25 (1981).

## *Failure to Seal the Tapes*

Section 10-408 (g) (2) of the Courts and Judicial Proceedings Articles provides:

> "(2) Applications made and orders granted under this subtitle shall be sealed by the judge. Custody of the applications and orders shall be wherever the judge directs. The applications and orders shall be disclosed only upon a showing of good cause before a judge of competent jurisdiction and shall not be destroyed except on order of the issuing or denying judge, and in any event shall be kept for ten years."

At the conclusion of the interception the tapes, along with certain documentation, were delivered into the custody of the judge who had signed the original order. The judge placed this evidence in a box, taped the box, placed his signature on the tape and delivered the box into the custody of the State Police. When the box was presented to the court during the suppression hearing the tape on one side of the box had been completely severed, the seal had been broken, and additional tape had been placed on the box and over the judge's signature. The hearing judge described the condition of the box as follows:

> "Now on the top of the box, which is the opposite side of where the masking tape was, where Judge Thieme signed on the side of this cardboard box the tape seems to go completely around the box and it was the tape used, which I, incidentally, use the same kind of tape when I seal boxes for this purpose. And on one of the sides of the top, the, um, the tape is severed, completely severed, and it has been patched with Scotch tape. I find as a matter of fact that the tape, the bottom of the box the seal is broken, on the side of the box where the tape is

severed, the tape is severed to that extent. It does not allow ingress and egress to the box of any magnitude. You can slip your fingers into it but you certainly can't get in there for any purpose for removal or distortion, um, of the objects that are in there."

Trooper Ralph Kabernagel testified that he opened one side of the box to be sure that it contained all of the evidence he had been ordered to produce, because of a discrepancy between that order and the written inventory on the outside of the box. He stated that he did not know how the tape was broken on the other side of the box. In overruling appellant's motion to exclude, the hearing judge found that the trooper's explanation was reasonable and that, in any event, there had been no change or alteration of the evidence. There was no evidence produced by the appellant or any of the other defendants to indicate otherwise. *United States v. Lawson,* 545 F. 2d 557, 564-65 (7th Cir. 1975); *United States v. Sotomayor,* 592 F. 2d 1219, 1226 (2nd Cir. 1979). *See United States v. Curreri,* 388 F. Supp. 607, 612 (D. Md. 1974). This Court pointed out in *Nye v. State,* 49 Md. App. 111 (1981), at 122:

". . . a violation of the pertinent section as to the sealing requirement under Section 10-408 (g) (2) is punishable as contempt only under Section 10-408 (g) (3) and is not remediable by a suppression of the evidence under Section 10-408 (i)."

The ruling of the court was proper.

*Failure to render progress reports*

Section 10-408 (f) of the Courts and Judicial Proceedings Article provides:

"(f) *Reports to issuing judge.* — Whenever an order authorizing interception is entered pursuant to this subtitle, the order shall require reports to be made to the judge who issued the order showing

what progress has been made toward achievement of the authorized objective and the need for continued interception. The reports shall be made at the intervals the judge requires."

The authorizing judge ordered:

"That the State's Attorney for Anne Arundel County, or his designee, shall advise this Court of the progress of the interception toward achievement of the authorized objective, the current status of the investigation and the need for continued interception on each Wednesday throughout the course of the interception process and shall reasonably record the date, time and general content of such progress reports."

Appellant contends that there was no progress report for the last six days of the intercept, in violation of the above quoted provision of the court order and of Section 10-408 (f) *supra*. Citing *Baldwin v. State,* 45 Md. App. 378 (1980), *aff'd. State v. Baldwin,* 289 Md. 635 (1981), appellant avers that the trial judge erred by overruling his motion to suppress the fruits of the intercept. Although *Baldwin* does hold that the violation of Section 10-408 (f) is a violation of the intercept stage and, therefore, requires strict compliance with the statute, the violation of which would require suppression, the alleged violation in the case *sub judice* actually occurred after the intercept had ceased. From the record before us, the intercept terminated on the Tuesday before the Wednesday when the regular report would have been due. A full report, including the last six days of the intercept, was submitted to the judge within eight days of the conclusion of the intercept. As we pointed out in *Howard v. State,* 51 Md. App. 46 (1981) at 67:

"The progress report requirements are to be read in connection with the directives, § 2518 (5) of the federal law and § 10-408 (e) of the State law, that interception must terminate at the earlier of attainment of the authorized objective or 30 days.

> Thus, the progress reports enable the issuing judge to determine whether the interception authorization should be terminated before the expiration of thirty days."

Since the intercept terminated on the day before the regular Wednesday report and since the purpose of the progress report is to "enable the issuing judge to determine whether the interception authorization should be terminated before the expiration of 30 days", *Howard,* there was really no need for that Wednesday report. If there was a violation (and we hold there was not), it was harmless.

In *State v. Baldwin, supra,* at 643, the Court pointed out that "... the provisions of § 10-408 (f) constitute a mandatory *precondition for obtaining valid intercept* authority ..." and "that the wiretap order in this case *was issued* in violation of the requirements of that section." [1]

The Court was referring to pre-order compliance — that which is required before a valid order will issue. In the case before us, we have an alleged failure of post-order compliance which, as we pointed out in *Poore v. State,* 39 Md. App. 44 (1978) at 53-54 "... will not vitiate the order if there has been substantial compliance and no prejudice to the defendant is shown." This was cited with approval in *Howard,* wherein it was pointed out that *Baldwin v. State, supra,* explicated the same view. The trial judge properly overruled the motion to suppress.

### *Absence of factual presentation for continuance of the intercept*

After reading the affidavit, this Court concludes that the contention of the appellant "that the affidavit is absolutely void of any articulation of a factual presentation for the continuance of the tap" is baseless. In addition, because there is no argument on this issue set out in the brief as

---

1. *See* Gilbert, "A Diagnosis, Dissection, and Prognosis of Maryland's new Wiretap and Electronic Surveillance law," 8 U. Balto. L. Rev. 183, 210 (1979).

required by Maryland Rule 1031 c.5. we hold that appellant has waived his right to argue this point on appeal. *Van Meter, supra.*

## Probable Cause

Appellant contends that the application for the wiretap and its accompanying affidavits did not demonstrate probable cause to warrant issuance of the wiretap order. This contention is based on three premises, which were clearly refuted in an excellent argument presented by Assistant Attorney General Ann E. Singleton, representing the State.

First, appellant avers that the information received from a confidential citizen informant was not shown to be reliable. The *Aquilar-Spinelli* requirements apply to determine if there is probable cause for issuance of a wiretap. *State v. Graziano,* 17 Md. App. 276 (1973). However, the test for reliability under the *Aquilar-Spinelli* analysis is less rigorous for a citizen than it is for an informant from the criminal milieu. *Mobley and King v. State,* 16 Md. App. 546, *aff'd.* 270 Md. 76 (1973); *Dawson v. State,* 14 Md. App. 18, 33 (1971) (concurring opinion, J. Moylan); *Anderson v. State,* 24 Md. App. 128, 175, *aff'd.* 427 U.S. 563 (1975).

In this case, the confidential citizen indicated to affiant Officer Davis that appellant's residence was the distribution point for a large narcotics operation in appellant's community. For a year prior to his statement to the police, the citizen had observed an extremely high volume of persons coming and going from appellant's residence. Most of the visits lasted only a few minutes, and some of the visitors even left their vehicles running during their visits. The citizen had also once observed appellant drive a car with Florida tags onto the property, and remove the car's hubcaps, from which appellant extracted plastic bags containing a white substance.

The veracity of an informant's information may be corroborated by independent police verification of the information received. *Stanley v. State,* 19 Md. App. 507, 529

(1974); *Pirner v. State,* 45 Md. App. 50 (1980); *Comi v. State,* 26 Md. App. 511 (1975). In this case, police surveillance observed numerous persons coming and going from appellant's residence, some of whom had criminal records, including violations of the controlled dangerous substance laws. The police also seized several garbage bags abandoned by appellant; in the bags they found marijuana and plastic bags containing powdery residues — some cocaine and some methaqualone. Another confidential informant, whose reliability has not been questioned, informed affiant Officer Davis that he had obtained cocaine from Robert Pessagno. Pessagno had said he distributed cocaine in partnership with a person in appellant's area, and affiant Officer Thomas observed Pessagno's car parked outside appellant's residence. Also, a pen register recorded a call from appellant's residence to the telephone number of the second informant.

As the record evinces, the application and affidavit were based upon reliable information received from persons inside and outside the criminal milieu, amply corroborated by independent police investigation. The sources of information were thus sufficiently reliable to support a finding of probable cause to issue the wiretap order.

Appellant's second premise is that the affidavit contains no facts implying that there were higher-ups in the conspiracy whose identities could be learned by use of a wiretap. He cites *Baldwin v. State,* 45 Md. App. 378, 391 (1980) for the proposition that a bald assertion of the desire to learn the identity of higher-ups is an insufficient predicate upon which to find probable cause for a wiretap.

This case is distinguishable. In *Baldwin* the suspect manufactured the controlled dangerous substance, and there was "not one scintilla of fact in the affidavit that (gave) rise to a reasonable inference the 'higher ups' existed." *Id.* In this case, the averments in the affidavit implied that appellant was not a manufacturer, but a middleman, distributing large quantities of CDS acquired exogenously. As adumbrated above, there was continuous traffic coming to and going from appellant's residence; some of these visitors

had been involved in CDS violations; a pen register recorded numerous phone calls from appellant's residence to persons with similar criminal backgrounds; and there was evidence that he had a partner in the distribution scheme. These averments are sufficient to warrant a reasonably cautious person in believing that a wiretap was needed to identify appellant's supply sources. *See Nye v. State,* 49 Md. App. 111, 120 (1981).

Appellant's third premise is that the application and affidavit did not evince probable cause to believe that the telephone in his residence was being used to further criminal activity. The aforementioned pen register evidence of calls to drug traffickers, coupled with the activity observed at appellant's residence, clearly raises the probability of criminal use of the telephone sufficiently to warrant issuance of a wiretap order. Only the probability and not a prima facie showing of criminal activity is the standard for probable cause. *Collins v. State,* 17 Md. App. 376, 384 (1973).

His three premises refuted, appellant offers no basis from which to conclude that the wiretap was issued without probable cause.

*Judgment affirmed.*

*Costs to be paid by appellant.*