## STATE OF MARYLAND v. HUGH HARTMAN BALDWIN, JR.

[No. 34, September Term, 1980.]

*Decided March 10, 1981.*

*Motion for reconsideration filed April 10, 1981; denied April 28, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Thomas P. Barbera, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellant and cross-appellee.

*William F. Sheehan,* with whom were *William N. Eskridge, Jr., Shea & Gardner, Alfred L. Scanlan, John D. Aldock, Richard H. Sothoron, Jr.,* and *Stanley J. Klos, Jr.,* on the brief, for appellee and cross-appellant.

MURPHY, C. J., delivered the opinion of the Court. ELDRIDGE, J., concurs in the result.

This case concerns the legality of an ex parte wiretap order issued by a judge in the Circuit Court for Talbot County, pursuant to the Maryland Wiretapping and Electronic Surveillance Law (the Act), Maryland Code (1974, 1980 Repl. Vol.) §§ 10-401 through 10-412 of the Courts and Judicial Proceedings Article. We granted certiorari primarily to determine whether the wiretap order complied with the provisions of § 10-408 (f) of the Act and, if not, the sanction to be applied for noncompliance. Section 10-408 (f) provides:

> "Whenever an order authorizing interception is entered pursuant to this subtitle, the order shall require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. *The reports*

*shall be made at the intervals the judge requires."*
(Emphasis added.)

Section 10-408 (i) relates to the suppression of the contents of illegally obtained communications and provides, in pertinent part:

"(1) Any aggrieved person in any trial, hearing, or proceeding . . . before any court . . . may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that:

(i) The communication was unlawfully intercepted;

(ii) The order of authorization under which it was intercepted is insufficient on its face, *or was not obtained or issued in strict compliance with this subtitle;* or

(iii) The interception was not made in conformity with the order of authorization." (Emphasis added.)

I

The wiretap order was issued on April 13, 1978, for a period not to exceed thirty days, and authorized a wiretap of the telephone of the Atlantic Glass Factory in Easton, Maryland, to obtain evidence of violations of the laws relating to Controlled Dangerous Substances. Among other recitals, the order provided that the intercepting police officers "shall be required to report to the Court on what progress has been made towards the achievement of the authorized objective and the need for continued interception at a time period and in a manner as designated by the Court." The issuing judge did not, however, specify the time or times, or the manner in which the police were required to report to him on the progress of the wiretap. Notwithstanding the absence of any such directives, the monitoring agents made weekly progress reports in writing to the issuing judge over a four-week period. The substance of four conversations intercepted as a result of the wiretap

was used by the police to aid in establishing the existence of probable cause for the issuance of a search warrant for the glass factory, but none of these conversations was reproduced or mentioned in any of the progress reports made to the court. Evidence seized during the execution of the search warrant at the glass factory implicated Hugh Hartman Baldwin, Jr. in violations of the laws relating to Controlled Dangerous Substances. A multi-count criminal information was thereafter returned against Baldwin, charging, among other offenses, that he did possess and manufacture designated Controlled Dangerous Substances at the glass factory on May 22, 1978, and that he operated a common nuisance at that location on that date.

Prior to Baldwin's trial, he moved to suppress the incriminating evidence derived from the wiretap on the ground that the order was invalid for noncompliance with the periodic reporting requirements of § 10-408 (f) of the Act. The trial court denied the motion. Baldwin was subsequently convicted by a jury of seven counts of violating the Controlled Dangerous Substances laws and operating a nuisance house.

The Court of Special Appeals reversed Baldwin's convictions, finding that the wiretap order was "legally infirm" because it was not issued in strict compliance with the periodic progress report requirement of § 10-408 (f) of the Act. *Baldwin v. State,* 45 Md. App. 378, 413 A.2d 246 (1980). The court rejected the view taken by the trial judge that the failure of the issuing judge to designate the time or times at which the progress reports were to be made was a post-interception variance with the statutory requirements, and that because there had been substantial compliance with the statute, the evidence obtained from the wiretap was properly admissible. Speaking through Chief Judge Gilbert, the Court of Special Appeals said that § 10-408 (f) requires that *"The issuing judge shall provide in the order for the interception that the police report to the judge at designated intervals on the progress being made by the police in attaining their objective." Id.* at 393 (emphasis in original).

Viewing the violation of § 10-408 (f) as either a pre-interception violation or a violation committed during the course of the execution of the wiretap order, as distinguished from a post-interception violation, the court concluded that "strict compliance with the State statute is mandated," citing, among other authorities, *State v. Siegel,* 266 Md. 256, 292 A.2d 86 (1972). *Id.* at 393.

*Siegel* involved an interpretation of the federal law governing wiretapping, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520 (1976). In that case, the wiretap order, issued pursuant to former Maryland law, Code (1974), §§ 10-401 through -408 of the Courts Article, failed to meet controlling federal statutory requirements that the surveillance was to be conducted over a limited time period; that it was to automatically terminate upon the attainment of the objective of the surveillance; and that the interception of nonpertinent conversations was to be minimized. Because of these omissions in the wiretap order, the Court held that the evidence obtained from the wiretap had to be suppressed because "the surveillance here failed to meet certain preconditions designed to protect appellee's constitutional rights." 266 Md. at 274. Judge Digges, for the Court, said that the federal law "sets up a strict procedure that *must* be followed and we will not abide any deviation, no matter how slight, from the prescribed path." *Id.* (emphasis in original).

Before us the State argues that while § 10-408 (f) requires that a wiretap order contain a provision for periodic progress reports to be made to the issuing judge, the section does not require that the intercept order itself specify the designated reporting intervals. The State points out that the directive contained in § 10-408 (f) is a limited one, *i.e.,* "the order shall require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception." The order was in compliance with this provision, the State argues, and nothing in the remaining provision of § 10-408 (f) — that reports be made "at the intervals the judge requires" — mandates that the

reporting intervals, or the manner of reporting, be designated in the wiretap order. The State maintains that the issuing judge cannot be expected reasonably to predict in advance, and incorporate in the order, the time, number and nature of progress reports necessary to effectuate the protective intent of § 10-408 (f). It is suggested that to require the inclusion of such provisions in the order itself would necessitate a new order, upon a new application, where the issuing judge determines, in the course of his supervision of the wiretap, to require more or less intensified reporting, as the evolving circumstances may dictate. The State claims that the wiretap order in this case was issued in strict compliance with § 10-408 (f) because it directed that progress reports be made to the issuing judge. The order being valid on its face, the State urges that suppression of the evidence derived from the wiretap was erroneous.

The State next argues that failure of the issuing judge to actually set time intervals for the progress reports was not, as in *Siegel,* a precondition to issuance of the order and because the monitoring agents actually made weekly progress reports, the "substantial compliance" standard of *Spease and Ross v. State,* 275 Md. 88, 338 A.2d 284 (1975), is applicable. In that case, the Court considered the requirement, among others, of § 2518 (8) of the federal wiretap statute that a person named in an intercept order be served with an inventory within ninety days of the wiretap's termination notifying him of certain information pertaining to the wiretap. The Court held that there had been substantial compliance with the federal law because the person named in the intercept order had actual knowledge of the required information within twelve days of its termination and no prejudice resulted from failure to serve him with the inventory contemplated by the statute. The Court declined to suppress evidence obtained from the wiretap, noting that strict compliance with the federal provision was not required because it "does not play a central role in the statutory scheme and is not a precondition to obtaining intercept authority under [*United States v.*] *Giordano*[, 416 U.S. 505, 94 S. Ct. 1820, 40 L. Ed. 2d 341 (1974),] and *Siegel.*" 275 Md. at 108. The State thus argues that even if § 10-408 (f) was

violated, the section does not play a central role in the statutory scheme and is not a precondition to obtaining intercept authority, and because there was substantial compliance with the requirements of the section by reason of the actual filing of progress reports by the monitoring police agents, suppression was not an appropriate remedy.

Finally, the State urges that if § 10-408 (f) requires that the wiretap order itself designate the intervals in which progress reports are to be made, as the Court of Special Appeals held, the holding should be given only prospective application. This is so, according to the State's argument, because until this case § 10-408 (f) was not viewed as requiring the order authorizing interception to contain an explicit statement of the designated intervals in which progress reports were to be made.

In *State v. Mayes,* 284 Md. 625, 627, 399 A.2d 597 (1979), we briefly sketched "the workings and inter-relationship" of the federal and Maryland statutory provisions dealing with wiretapping. We there noted, as we did in *Siegel,* that in enacting the federal law the Congress insured that a uniform minimum national standard would govern the use of wiretaps, which the states could adopt by statute so long as the standards were not more lenient than those contained in the federal law, although they could be made more restrictive. The present Maryland Act was adopted in 1977 after our decisions in *Siegel* and *Spease and Ross;* it was modeled upon the federal act and extensively tracked its provisions. In some particulars, however, the Maryland Act was made more restrictive than the federal law. For example, § 10-408 (f) of the Act — the provision involved in this case — is phrased in mandatory language, *i.e.,* the wiretap order "shall" require reports which "shall" be made at the intervals the issuing judge requires. The federal counterpart of § 10-408 (f) is 18 U.S.C. § 2518 (6) and is written in permissive terms, *i.e.,* the wiretap order "may" require reports to be made to the issuing judge.[1]

---

1. 18 U.S.C. § 2518 (6) provides that

"Whenever an order authorizing interception is entered pursuant to this chapter, the order *may* require reports to be made to

In *State v. Bailey,* 289 Md. 143, 422 A.2d 1021 (1980), we considered the legality of a wiretap order issued under the Act, which did not contain a directive as required by § 2518 (4) (e) of the federal law and § 10-408 (e) of the Maryland Act to terminate the wiretap upon the attainment of the authorized objective.[2] Judge Cole, for the Court, stated that the omitted provision was a necessary and minimal prerequisite to a valid intercept order under both the federal and state law. We said that incriminating evidence obtained under the wiretap order had to be suppressed in accordance with the provisions of § 10-408 (i) of the State Act, which mandate suppression where the order of authorization is "insufficient on its face" or was "not obtained or issued in strict compliance with this subtitle." We said that the language of the Maryland Act was "unequivocal, leaving no room to doubt that the legislature intended that the wiretap order conform scrupulously to the mandate of the statute." *Id.* at 152. We found no conflict between the *Siegel* strict compliance test, which involved "preconditions" to the issuance of a valid wiretap order, and the substantial compliance test of *Spease and Ross,* which involved an order valid on its face and in conformity with the preconditions essential to the issuance of a valid order of interception.

---

the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such·reports shall be made at such intervals as the·judge *may* require." (Emphasis added.)

This section has been held to be not binding upon the issuing judge. *See, e.g.,* United States v. Scafidi, 564 F.2d 633 (2nd Cir. 1977), *cert. denied,* 436 U.S. 903, 98 S. Ct. 2231, 56 L. Ed. 2d 401 (1978). While 23 jurisdictions have enacted legislation pursuant to Title III, *see* C. Fishman, *Wiretapping and Eavesdropping* § 5 (1978), nearly all of them have adopted the permissive language of the federal section. Virginia, however, like Maryland, is an exception; its statute is virtually identical to § 10-408 (f) of the Maryland Act. Although there appears to be no reported cases dealing with the Virginia statute, its language indicates its mandatory nature. *See Criminal Law, Eighteenth Annual Survey of Developments in Virginia Law: 1972-1973,* 59 U. Va. L. Rev. 1458 (1973).

**2.** Section 10-408 (e) provides in part that a wiretap order "shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this subtitle, and must terminate upon attainment of the authorized objective, or in any event in 30 days."

As earlier indicated, § 10-408 (f) directs in mandatory terms that the wiretap order contain a provision that periodic reports be made to the issuing judge so as to permit him to evaluate what progress is being made toward achievement of the authorized objective and the need for continuing interception. This provision, coupled with the further requirement of the section that the reports "shall be made at the intervals the judge requires," is implementary of § 10-408 (e) of the Maryland Act (see fn. 2, supra) — a minimum standard required by § 2518 (5) of the federal law which provides that a wiretap order may not be issued for a period "longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days"; and that the order shall contain a further provision that the authorization to intercept "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under the chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days."

We think the provisions of § 10-408 (f) constitute a mandatory precondition for obtaining valid intercept authority, and we agree with the Court of Special Appeals that the wiretap order in this case was issued in violation of the requirements of that section. We so conclude, not because the order itself failed to contain a provision fixing the reporting intervals, but because the issuing judge never gave the monitoring agents any instructions, in writing or otherwise, at the time the order was executed, or thereafter, designating any time period for the progress reports to be made. Even though the order contained a provision requiring that reports be made, the section is violated where the issuing judge fails, as here, to give any instructions concerning the time intervals for reporting. The establishment of these intervals by the issuing judge is essential to safeguard against unwarranted intrusions on personal privacy rights, and, unlike the situation in Spease and Ross, is central to the statutory scheme — a precondition to the issuance of a valid order, as in Siegel and Bailey. It is clear to us that the Maryland legislature, in enacting the provi-

sion of § 10-408 (i) that suppression was an appropriate remedy where the order of interception was not issued "in strict compliance" with the Act, intended to adopt the *Siegel* standard to govern violations of preconditions to the issuance of a valid order. Obviously, as Baldwin argues, there cannot be strict compliance with such a mandatory requirement of the statute where, as here, it was totally disregarded. Nor does the fact that the officers actually filed weekly progress reports with the issuing judge cure the violation of § 10-408 (f). Similar arguments, advanced both in *Katz v. United States,* 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), and in *State v. Bailey, supra,* were rejected because voluntary restraints imposed by the monitoring agents upon themselves are not the equivalent of a judicial order authorizing interception in accordance with statutory requirements.

We do not agree, however, with the Court of Special Appeals that § 10-408 (f) requires that the order itself incorporate a schedule of the reporting intervals required by the issuing judge. No such requirement is contained in § 10-408 (f). We think the statutory directive that the reports be made "at the intervals the judge requires" is met where the issuing judge orders the making of reports at designated intervals, the first of which must be scheduled at the time the wiretap authorization is initially given. The statute does not specify whether the required reports must be in writing or may be verbal, nor does it indicate that the judge's designation of the reporting intervals need be in writing or may be orally imparted to the monitoring agents. We think the latter requirement is best satisfied by a written directive which may, but need not, be included in the wiretap order, depending upon the circumstances as the issuing judge may determine at the time of the authorization. A written directive independent of the wiretap order itself, given at the time the order is executed, is, we think, the preferable method of compliance with the statute, since it reduces the likelihood of any misunderstanding of the judge's initial instructions, and permits more flexibility in changing the reporting intervals without the necessity for a new order, as

circumstances may dictate in the course of the judge's supervision of the wiretapping activity.

For the reasons stated, the wiretap order in this case violated § 10-408 (f) and the evidence obtained thereunder properly should have been suppressed.

## II

Of the seven counts upon which Baldwin was found guilty, three involved violations with which he was connected at a farmhouse outside of Easton, about six miles from the glass factory. A warrant was issued to search the farmhouse and large quantities of illegal drugs were confiscated. The Court of Special Appeals held that the affidavit for the search warrant of the farmhouse was based on a showing of probable cause, obtained independently of the wiretap, and that the incriminating evidence was properly admissible at Baldwin's trial. That court nevertheless reversed the convictions and remanded for a new trial "because there is no way to determine what effect the illegally obtained evidence had on the minds of the jurors, vis à vis, the legally admissible evidence, nor can we determine how the jury sifted, weighed and applied the evidence to the various counts of the indictment." *Baldwin v. State, supra,* 45 Md. App. at 395.

We granted certiorari on Baldwin's cross-petition for certiorari to consider his contention that the Court of Special Appeals wrongly concluded that there was probable cause to search the farmhouse property. He argues that the application for the warrant suggested no more than a suspicion or possibility that violations of the law had occurred or were occurring on the property. He does not contend that any of the tainted wiretap evidence was utilized to establish probable cause to search the farmhouse but rather that there was no foundation in the affidavit for the belief that any crime he allegedly committed was in any way connected with the farmhouse property. He argues that the averments in the affidavit for the search warrant are precisely the sort of "per

se factually innocuous" circumstances that we found insufficient in *Everhart v. State,* 274 Md. 459, 337 A.2d 100 (1975), a case, according to Baldwin, in which we held that direct evidence of drugs or drug-making apparatus on the premises must be demonstrated on the face of the affidavit to support a search warrant. We find no merit in Baldwin's argument.

In *Everhart,* the defendant's rented farmhouse was searched and evidence was seized under a search warrant. The affidavit for the warrant contained a great deal of information concerning Everhart and his codefendant but only three allegations remotely involving the farmhouse itself: that a known drug addict had informed police that he had tried to purchase drugs at the farmhouse from the codefendant; that a confidential informant had informed police that the codefendant had sold drugs to a known drug user there; and what Baldwin characterizes as "police observation of suspicious bags on the farm." We found that the first two allegations were insufficient to establish probable cause to search the farmhouse. *Id.* at 474. We reversed and remanded the case for a new trial, however, to determine if the acts of the police in searching for and seizing the bags violated Everhart's Fourth Amendment rights, *id.* at 486. If there was such a violation, we said that the information obtained could not be used to establish probable cause in the absence of attenuation or an independent source of the information. *Id.* at 480.

Thus, Baldwin is simply wrong when he contends that we held that the allegations in *Everhart,* taken as a whole, were insufficient to establish probable cause. In the present case, for the reasons articulated by the Court of Special Appeals, we think the affidavit, based on personal observations of Baldwin's activities at the farmhouse, together with knowledge from reliable sources, contained sufficient information, independent of evidence derived from the wiretap, to establish probable cause that Baldwin was connected with the illegal possession of Controlled Dangerous Substances at the farmhouse. While we do not view the probable cause issue

as a close one in this case, we nevertheless recognize the well-established principle that even in cases involving only a marginal showing of probable cause, the question will be "largely determined by the preference to be accorded to warrants," *United States v. Ventresca,* 380 U.S. 102, 109, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965), and *Jones v. United States,* 362 U.S. 257, 270, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960).

*Judgment affirmed; costs to be equally divided between the parties.*

Judge Eldridge concurs in the result.