492 A.2d 1328

**Oscar CORDOVI**

v.

**STATE of Maryland.**

**No. 747, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

June 5, 1985.

456

Jerome James LaCorte, Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on brief), for appellant.

Diane G. Goldsmith, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, Andrew L. Sonner, State's Atty., Montgomery County, and Roger W. Galvin, Asst. State's Atty., Montgomery County, Rockville, on brief), for appellee.

Submitted before MOYLAN, ADKINS and BLOOM, JJ.

ADKINS, Judge.

The appellant, Oscar Cordovi, was convicted in the Circuit Court for Montgomery County of second degree rape and second degree sexual offense. On appeal he asserts the following three grounds for reversal of these convictions:

    1. The State's use of the prior recorded testimony of an absent witness violated Cordovi's constitutional right to confront a witness against him;

    2. The court below should have allowed him to introduce evidence that would have cast doubts on the believability of the absent witness; and

    3. Defects in the charging documents deprived the trial court of jurisdiction to try him for second degree rape and second degree sex offense.

### Factual Background

Oscar Cordovi lived with his roommate, Johnny Gutierrez, in an apartment in Silver Spring. On September 19, 1983, the roommates were visited by a woman (the victim). Ap-

parently, she had consensual sexual intercourse with Gutierrez and fell asleep with him on the living room floor. Later that night, she awoke to find Cordovi masturbating over her. When she sat up quickly, Cordovi dressed himself and departed. The victim then attempted to rouse the slumbering Gutierrez to inform him of his roommate's actions. Gutierrez did not respond, and the victim left the apartment.

As she departed, the victim noticed that Cordovi was following her. When she ignored his pleas for conversation, he seized her arm and commanded that she return to the apartment. As the two re-entered the apartment, they were confronted by Gutierrez. Now brandishing a knife, Cordovi persuaded Gutierrez to depart. Cordovi then took the victim into his bedroom where she was forced to perform fellatio and vaginal intercourse. After this was over, the appellant prepared coffee for his victim and chivalrously escorted her to her car.

## I. *Confrontation*

The appellant's initial contention is that the trial court erred by allowing the State to use the testimony of Johnny Gutierrez that had been recorded at the appellant's preliminary hearing. Gutierrez, as the appellant conceded below, was in his native Colombia at the time of trial. It appears that the State became aware of this when a summons it had issued for Gutierrez on February 24, 1984, was returned non est on March 1st (the trial took place on March 14–16). When the summons was returned non est, the State contacted Gutierrez's family; his brother advised that the witness was in Colombia, but that Gutierrez was aware of the trial date. The State did nothing further to attempt to secure the witness' attendance.

Both the Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights guarantee an accused the opportunity to confront all

witnesses who testify against him.[1] These rights exist for two reasons.

■ First, they provide the defendant with an opportunity to challenge the accuracy of the witness' testimony by "testing the recollection and sifting the conscience of the witness." *Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 339–40, 39 L.Ed. 409 (1895). Second, they compel the witness to appear in open court, before the fact-finder who must appraise the witness' credibility and demeanor. *Id.*

■ In *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Court recognized that certain exceptions to the hearsay rules satisfy both of these interests. *Id.* at 66, 100 S.Ct. at 2539. Specifically, in cases involving prior recorded testimony, no violation of the right to confrontation will occur when the State can show that 1) the witness is unavailable, and 2) there is a "particularized guarantee of trustworthiness." *Id.; Moon v. State*, 300 Md. 354, 368–69, 478 A.2d 695 (1984).

## A. *Unavailability*

■ The State must not only show unavailability, but it must prove that it made "a *good faith effort* to obtain [the witness'] presence at trial." *Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543 (emphasis original). Explaining what was meant by good faith, the *Roberts* court remarked:

> The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures

---

**1.** The rights conferred by the federal and state constitutions are co-extensive. *Moon v. State*, 300 Md. 354, 359, 478 A.2d 695 (1984) ("these provisions secure '[t]he same right'") (quoting *Crawford v. State*, 282 Md. 210, 211, 383 A.2d 1097 (1978); *Baldwin v. State*, 56 Md.App. 529, 538 n. 1, 468 A.2d 394 (1983). For a discussion of the separate histories of each, *see Moon*, 300 Md. at 359–68, 478 A.2d 695.

might produce the declarant, the obligation of good faith may demand their effectuation. "The lengths to which the prosecution must go to produce a witness ... is a question of reasonableness" [citations omitted]. The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate.

448 U.S. at 74–75, 100 S.Ct. at 2543.

■ When a witness is absent from the State in which trial is to be held, but within the United States, a mere showing that the witness is absent from the trial jurisdiction is insufficient to demonstrate unavailability. In that circumstance, the prosecution must show good faith efforts to procure the witness. *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). This is so because there are procedures for compelling the presence of such a witness. *See, e.g.,* Md.Cts. & Jud.Pro.Art. §§ 9–301—9–306 (1984) (the Maryland Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings). It is otherwise when the witness is in a foreign nation and beyond the reach of State process. That is the teaching of *Mancusi v. Stubbs*, 408 U.S. 204, 212, 92 S.Ct. 2308, 2312, 33 L.Ed.2d 293 (1972). There, the Supreme Court, distinguishing *Barber*, held that unavailability was sufficiently established, without a showing of good faith efforts to obtain the witness, when it appeared that at the trial date the witness was in Sweden and the trial State was "powerless to compel his attendance at the second trial ... through its own process...." That is also the effect of our holding in *Baldwin v. State*, 56 Md.App. 529, 538–39, 468 A.2d 394 (1983) ("[t]he court's discretion is not abused in deciding that a witness outside the country is unavailable for trial, thus allowing the introduction into evidence of previously recorded testimony....").

■ The appellant makes much of the State's failure to explain its efforts to locate Gutierrez on the day of trial. As we have already seen, it was conceded that he was then in Colombia. Clearly, an effort to pinpoint his whereabouts on that date would have been futile and hence unnecessary. *Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543; *see Baldwin*, 56 Md.App. at 539, 468 A.2d 394.

■ The appellant next attempts to show that the State acted in bad faith by not taking additional steps to guarantee Gutierrez's appearance at trial. Initially, we note that the appellant correctly asserts that the State knew that Gutierrez was a foreign national and that he was planning to return to his native country for the Christmas holidays. Furthermore, it is true that defense counsel did notify the State that the witness was apprehensive about becoming involved in the case. Ending his review of the record with these undisputed facts, the appellant concludes that the State was constitutionally bound to prevent Gutierrez from leaving the country. In other words, he would have us find "bad faith" anytime a prosecutor allows an apprehensive witness to leave the country.

There is much in the record, however, to justify the prosecutor's belief that Gutierrez would be present in court on the day of trial. First, his residency status suggested he would return. His family was living in the Washington, D.C. area, and his immigration status was that of a resident alien. Also, the record shows that he was employed. Second, Gutierrez had responded once before to a summons and testified against the appellant at a preliminary hearing. This was viewed as very important by the assistant state's attorney involved in the case. He concluded that Gutierrez

was extremely cooperative during the course of that conversation and indicated that he would be more than willing to come back and also during the course of that hearing, I realized during the course of the testimony at the preliminary hearing, it had developed that he had only known this defendant [appellant] for a matter of two

weeks. He at that point I felt had no motive or no reason to really want to avoid coming to Court and testifying. It was not like they were close personal friends and he would not want to come to Court and testify against him. He was more than happy to come and testify. He indicated he was going back home, he would be there for a short period of time or for not a really short period of time, but for a vacation and that he would be returning to this country and he would be more than willing to testify.

In addition, at the November 17, 1983 preliminary hearing, the prosecutor informed Gutierrez that trial would "probably be ... 120, 140 - - 100 and some days down the road." The witness responded "that he would certainly be back over by that date." After this conversation, the prosecutor "felt very much at ease with [Gutierrez's] availability."

Perhaps the prosecutor was fooled; perhaps the witness simply changed his mind after he returned to Colombia. Either way, we cannot say that the prosecutor acted in bad faith. At the very least, we cannot say that the court below, having heard the testimony and viewed the demeanor of the prosecutor, erred in finding that the State acted in good faith.[2]

B. *Particularized Guarantee of Trustworthiness*

■ A recognized exception to both the hearsay and confrontation requirements is the use of testimony that was recorded at a previous judicial proceeding. *Roberts*, 448 U.S. at 65–67, 100 S.Ct. at 2538–2540; *Barber v. Page*, 390 U.S. 719, 722, 88 S.Ct. 1318, 1320, 20 L.Ed.2d 255 (1968). "This exception has been justified on the ground that the right of cross-examination initially afforded provides substantial compliance with the purpose sufficiently behind the confrontation requirement." *Barber*, 390 U.S. at 722, 88 S.Ct. at 1320. That is, it tests the accuracy and veracity of

---

**2.** Under these circumstances, we do not think "good faith" required the State to seek Gutierrez's incarceration under the provisions of § 9–203 of the Courts Article.

a witness's testimony. *See supra,* page 1331. As long as there was an adequate opportunity to cross-examine, testimony given at a preliminary hearing can be admitted without violating the right to confrontation. *California v. Green,* 399 U.S. 149, 165–68, 90 S.Ct. 1930, 1938–40, 26 L.Ed.2d 489 (1970); *Crawford v. State,* 282 Md. 210, 220–21, 383 A.2d 1097 (1978).

■ The thrust of the appellant's contention is that his counsel was not given an adequate opportunity to cross-examine Gutierrez at the preliminary hearing because the State failed to disclose the contents of the police report and the witness's statement until a short time before the hearing. Apparently, prehearing counsel did not share this belief. Not only is the hearing record devoid of any protest or motion for continuance, but counsel proceeded to cross-examine Gutierrez on information contained in his statement. The proper forum to raise this argument was the preliminary hearing. Because it was not raised there, we cannot decide it here. Md.Rule 1085.

## II. *Credibility of the Absent Witness*

In his case in chief below, the appellant offered the testimony of Rolando Bahamonde. According to the appellant's proffer, Bahamonde would testify that shortly after the rape he engaged Gutierrez in a telephone conversation and that Gutierrez became very nervous when asked about the rape. Also, Bahamonde would testify that Gutierrez made statements that were "consistent" with his preliminary hearing testimony "in a *manner* that would indicate both its falsehood and that of the testimony at trial." [emphasis in original]. The Trial court sustained the State's hearsay and relevancy objections.

### A. *Hearsay*

■ Hearsay is generally defined as testimony "in court of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibili-

ty of the out-of-court asserter." *Mutyambizi v. State*, 33 Md.App. 55, 65, 363 A.2d 511 (1976) (quoting E. Cleary, *McCormick on Evidence*, § 246 (2d ed. 1972)), *cert. denied*, 279 Md. 684 (1977).

It is important to note at the outset that only part of Bahamonde's testimony was hearsay. To the extent that he was to testify about his appraisal of Gutierrez's telephonic demeanor, this testimony would not be hearsay. It was his observation that the jury was called upon to appraise and not the truth of anything that might have been communicated to him. *See Cumberland & Allegany Gas Company v. Caler*, 157 Md. 596, 600, 146 A. 750 (1929). In short, "[t]he use of such testimony does not require a reliance by the jury or judge upon the competency of the person who originally made the statements for the truth of their content." *Patterson Agency, Inc. v. Turner*, 35 Md.App. 651, 654, 372 A.2d 258, *cert. granted*, 281 Md. 742 (1977), appeal dismissed by appellant (11/14/77) (quoting *Creaghe v. Iowa Home Mutual Casualty Co.*, 323 F.2d 981, 984 (10th Cir. 1963)). The trial court was also aware of this rule because it correctly allowed Bahamonde to testify that Gutierrez was "quite detached, very cold faced."

It was not until the witness began to testify about what Gutierrez said that objections were sustained. This line of testimony, as the appellant readily concedes, was undoubtedly hearsay. Cordovi believes, however, that it was subject to an exception because it was a prior *consistent* statement by Gutierrez that somehow contradicted his testimony at the preliminary hearing.

The appellant's arguments misconceive the hearsay rules. First, contradiction, standing alone, is not a basis for admitting evidence. *Deblasi v. State*, 60 Md.App. 154, 159–60, 481 A.2d 804 (1984). Rather, the proffered contradictory evidence must be relevant to either a material issue or to discrediting the witness. *Id.* To fall within the second grouping, the evidence must be admissible under one

of the accepted methods of impeachment. *See generally* E. Cleary, *McCormick on Evidence* §§ 33–47 (3d ed. 1984).

One accepted method of impeachment is the use of a prior inconsistent statement. But the rules governing prior consistent statements are inapplicable here.[3] Generally, a prior consistent statement is only admissible to rehabilitate a witness whose credibility has been impeached. *See Thomas v. Owens,* 28 Md.App. 442, 449, 346 A.2d 662 (1975). More importantly, this exception to the hearsay rules does not authorize use of a prior consistent statement to raise an inference that it is false. If the first statement was false, and the testimony at trial merely repeats it, the earlier statement is merely cumulative of the testimony at trial. As such, there is no need to admit the hearsay. Accordingly, we are unable to conclude that the repetition of testimony during a telephone conversation amounts to impeachment.

### B. *Relevancy*

Because we have concluded that the trial court did not err when it refused to admit Bahamonde's testimony, we need not decide the relevancy issue.

### III. *Charging Document*

The appellant raises the sufficiency of the charging document for the first time on appeal. Ordinarily, we will not review a question that was not presented and decided below. Md.Rule 1085. A recognized exception to this rule arises when a charging document, by its terms, is so defective that it deprives the trial court of jurisdiction. *Williams v. State,* 302 Md. 787, 490 A.2d 1277 at 1279–1280 (1985); *Hall v. State,* 57 Md.App. 1, 6, 468 A.2d 1015 (1983);

---

**3.** The appellant apparently concedes that the evidence could not be admissible as a prior inconsistent statement. Because Gutierrez was not present on the date of trial, it would have been impossible for the appellant to lay the proper foundation. *State v. Kidd,* 281 Md. 32, 46 n. 8, 375 A.2d 1105, *cert. denied,* 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977).

*aff'd,* 302 Md. 806, 490 A.2d 1287 (1985). In *Brown v. State,* 44 Md.App. 71, 410 A.2d 17 (1979), for example, the court determined that a problem with a charging document represented a jurisdictional flaw because it cast the allegations in terms that could have included either murder or manslaughter. *Id.* at 78, 410 A.2d 17. Thus, the flaw was "mortal." *Id. Compare Whitehead v. State,* 54 Md.App. 428, 458 A.2d 905 *cert. denied,* 296 Md. 655 (1983) (short-form indictment under theft statute jurisdictionally adequate).

Turning to the facts of this case, we note initially that a second degree rape can be accomplished three different ways. Section 463 of Article 27 specifies that a second degree rape has been committed when the defendant "engages in vaginal intercourse with another person:"

(1) By force or threat of force against the will and without the consent of the other person; or

(2) Who is mentally defective, mentally incapacitated, or physically helpless, and the person performing the act knows or should reasonably know the other person is mentally defective, mentally incapacitated, or physically helpless; or

(3) Who is under 14 years of age and the person performing the act is at least four years older than the victim.

The section represents a 1976 legislative move to consolidate common law rape and statutory rape, then referred to as carnal knowledge. Md.Ann.Code, Art. 27, § 462A (repealed 1976). *See generally* Note, *Rape and Other Sexual Offense Law Reform in Maryland 1976–77,* 7 U.Balt.L. Rev. 151 (1977).

▮▮▮▮ Cordovi was charged with having committed a "rape ... in violation of Article 27, Section 463." He correctly points out that the indictment does not specify which of the three methods were used to commit the crime. He incorrectly assumes that this is a jurisdictional defect. In *Williams,* the Court of Appeals articulated what we shall refer to as the "common parlance" rule. Under this rule,

an indictment is not jurisdictionally flawed if a word it uses can be made more definite by looking to the term's use in "common parlance." 490 A.2d at 1280. Thus, the *Williams* court concluded that by including the word "robbery" in an indictment, the State had effectively charged the defendant with the crime that was commonly understood to be robbery. *Id.* The same thing happened here. The common parlance definition for rape is "[u]nlawful sexual intercourse with a female without her consent." Blacks Law Dictionary 1134 (Deluxe 5th ed. 1979). That is the very type of rape for which the appellant was tried and of which he was convicted. Since the charging document adequately informed Cordovi of the rape offense which he was required to defend, there was no jurisdictional flaw under the circumstances of this case.

This leaves count six of the indictment which charges Cordovi with a second degree sexual offense. The appellant would have us read this count in a vacuum. We do not condone such an emphasis of form over substance. Once again, we begin by noting that a second degree sexual offense can be committed three different ways:

A person is guilty of a sexual offense in the second degree if the person engages in a sexual act with another person:

(1) By force or threat of force against the will and without the consent of the other person; or

(2) Who is mentally defective, mentally incapacitated, or physically helpless, and the person performing the act knows or should reasonably know the other person is mentally defective, mentally incapacitated, or physically helpless; or

(3) Who is under 14 years of age and the person performing the act is at least four years older than the victim.

Md.Ann.Code Art. 27, § 463(a) (1982).

We are aware that the sixth count of the indictment did not specify which of these three avenues was taken by

the defendant. But, as we noted in *Manigault v. State*, 61 Md.App. 271, 282–84, 486 A.2d 240 (1985), an indictment must be read in its entirety, not as a series of unconnected counts. The second and sixth counts, along with all the other counts lodged against the defendant, referenced an incident which took place on September 20, 1983, in which the victim was subjected to a second degree sexual offense. And, as we noted above, count two charged Cordovi with having accomplished his rape of the victim by force or threat of force.

Thus, because the incident and victim mentioned in both counts are identical, logic compels us to conclude that the force and threat of force used to commit the rape in count two were also used to commit the sexual offense charged in count six. To conclude otherwise would lead to the perplexing result of holding that the victim, who was not under fourteen or incompetent in count two, might have been under fourteen or incompetent in count six. In short, count two places a limitation on the means used to commit the crime against the victim that survived to limit how the same attack was committed in count six. Accordingly, count six only charged the appellant with having committed a second degree sexual offense by force or threat of force.

Both Article 21 of the Maryland Declaration of Rights and the common law require that a charging document apprise the accused of the specific crime he is accused of having committed. *Williams*, 490 A.2d at 1279. Neither the Constitution, the common law, nor the Maryland Rules prescribe a set formula as to how this is to be accomplished. Reading the indictment as a whole, and drawing upon the "common parlance" rule, we are satisfied that the indictment returned in this case sufficiently notified the appellant of the specific crimes with which he was charged.

JUDGMENTS AFFIRMED.

APPELLANT TO PAY THE COSTS.